IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| GEORGE H. PETTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14CV389 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff George H. Petterson ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") on September 21, 2009, alleging a disability onset date of April 29, 2009. (Tr. at 21, 351-361.)[1] His applications were denied initially (Tr. at 101-22) and upon reconsideration (Tr. at 123-36, 223-32). Thereafter, Plaintiff

---
[1] Transcript citations refer to the Sealed Administrative Transcript of Record [Doc. #7].

requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 243.) Plaintiff, along with his attorney and an impartial vocational expert, attended the subsequent hearing on November 18, 2010. (Tr. at 41-67.) Following a denial decision issued January 21, 2011 (Tr. at 137-52), the claimant filed a request for review, which was granted by the Appeals Council (Tr. at 213-16). The Council found that further assessment of Plaintiff's past relevant work at step four of the sequential analysis was warranted, and remanded the case for a new hearing in that basis. (Id.)[2] In addition, the Council found that Plaintiff had filed a subsequent claim for benefits on March 21, 2011, and the claims were associated and remanded to the ALJ to issue a new decision as to all of the claims. (Tr. at 215.)

Accordingly, the ALJ held a supplemental hearing on January 29, 2013 (Tr. at 68-100), following which the ALJ again concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 34). On March 13, 2014, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-5.)

II.   LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must

---

[2] The Appeals Council further noted that Plaintiff's subsequently filed DIB and SSI claims, filed on March 21, 2011, were duplicate claims and ordered the ALJ to associate the claim files and issue a new decision on the associated claims. (Tr. at 216.)

2

uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

4

step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his alleged onset date, April 29, 2009. Plaintiff therefore met his burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

5

suffered from the following severe impairments: bipolar disorder, depression with psychotic features, and anxiety. (Tr. at 24.) The ALJ found at step three that none of these impairments met or equaled a disability listing. (Tr. at 25-27.) Therefore, she assessed Plaintiff's RFC and determined that he could perform

> [a] full range of work at all exertional levels but with the following nonexertional limitations: the claimant has the ability to sustain attention and concentrate for two hours at a time. He has the ability to follow short, simple (not detailed) instructions and perform routine tasks. He cannot work at a production rate or demanding pace. He can work with occasional contact or interaction with coworkers and supervisors but cannot work in contact with or interaction with the public. He needs to avoid work environments dealing with crisis situations, complex decision making, and constant changes in a routine setting.

(Tr. at 27.) Based on this determination, the ALJ found under step four of the analysis that Plaintiff could not return to his past relevant work. (Tr. at 32.) However, based on the vocational expert's testimony, the ALJ concluded at step five, that, given Plaintiff's age, education, work experience, RFC, and the vocational expert's testimony as to these factors, he could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 33-34.)

Plaintiff now challenges the ALJ's decision on four grounds. Specifically, he argues that the ALJ (1) erred by failing to assign weight to the opinions of Plaintiff's treating psychiatrist, Dr. Robert J. McHale, (2) failed to properly weigh his numerous Global Assessment of Functioning, or GAF, scores as medical opinions, (3) failed to consider a third party function report completed by Plaintiff's mother, and (4) failed to comply with the Fourth Circuit's recent decision in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). For the reasons set out below, the Court concludes that remand is required in light of Plaintiff's first two contentions.

A. Treating Psychiatrist Opinion

First, Plaintiff correctly notes that the ALJ failed to explicitly assign weight to a Mental RFC Questionnaire completed by Dr. McHale on January 16, 2013. As part of this contention, Plaintiff asserts that the ALJ failed to analyze Dr. McHale's opinions in accordance with Social Security Ruling ("SSR") 96-2p and 20 C.F.R. § 404.1527(c), better known as the "treating physician rule." The treating physician rule generally requires an ALJ to give controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record," it is not entitled to controlling weight. See Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2; 20 C.F.R. §§ 404.1527(c)(2); see also Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178. Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion. When an ALJ declines to assign controlling weight to a medical opinion, she must "'explain in the decision the weight given' thereto and 'give good reasons in [her] . . . decision for the weight.'" Chirico v. Astrue, No.

7

3:10CV689, 2011 WL 6371315, at *5 (E.D. Va. Nov. 21, 2011) (unpublished) (quoting 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2)). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thomas v. Comm'r of Soc. Sec., No. Civ. WDQ-10-3070, 2012 WL 670522, at *7 (D. Md. Feb. 27, 2012) (unpublished) (citing Blakely v. Comm'r of Soc. Sec., 581 F.3d 399, 409 (6th Cir. 2009); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011)).

In the present case, Dr. McHale was Plaintiff's treating psychiatrist at Monarch Behavioral Health. On January 16, 2013, Dr. McHale provided a 5-page Mental Residual Functional Capacity Questionnaire. Dr. McHale noted that Plaintiff had been treated at Monarch from October 11, 2011 to the present, with monthly office visits. Dr. McHale noted that on the DSM-IV Multiaxial Evaluation, Plaintiff's Axis I was "296.54", which is Bipolar I disorder, most recent episode depressed, severe with psychotic features, and "300.00", which is anxiety disorder. Plaintiff's current medications were Latuda, Lithium, Artane, and Ambien. Dr. McHale noted that Plaintiff was "compliant with medications, symptoms have reduced with treatment, but continues to have residual symptomology." Dr. McHale described his clinical findings as: "poor executive functioning skills, blunt affect, residual paranoia themes and auditory hallucinations." (Tr. at 900.) Dr. McHale noted Plaintiff's multiple symptoms and opined that Plaintiff had "no useful ability to function" in the areas of maintaining regular attendance, sustaining an ordinary routine, working in coordination or proximity to others without being unduly distracted, dealing with normal work stress, or completing a normal workday or workweek without interruption from psychologically based symptoms. (Tr. at 902.) Dr. McHale opined that Plaintiff's condition would cause him to be absent from work

8

more than four days per month. Finally, Dr. McHale noted that Plaintiff had positive symptoms of schizophrenia (hallucinations, paranoid thoughts) and negative symptoms of schizophrenia (ambivalence, social isolation, flat affect). (Tr. at 904.)

The ALJ discussed Dr. McHale's opinions and set out reasons for not assigning Dr. McHale's opinion controlling weight, but failed to specify the weight given to the opinion. Specifically, the ALJ addressed Dr. McHale's opinion as follows:

> Dr. McHale indicated that the claimant had received treatment from October 11, 2011, through January 16, 2013, and attended monthly visits. Dr. McHale noted that the claimant had been compliant with his medications and his symptoms had reduced with treatment[,] but he continued to have residual symptomology. However, I note that progress notes from Monarch as well as Daymark have repeatedly shown the claimant doing well. Dr. McHale noted that the claimant had side effects of his medication including drowsiness and slow body movements; however, office notes indicated that the claimant reported no problems with his medication and his mental status examination showed no problems in his psychomotor activities. Dr. McHale noted that clinical findings included poor executive functioning skills, blunt affect, residuals paranoid themes, and auditory hallucinations[,] but again office notes showed that the claimant denied paranoia and hallucinations or noted a significant decrease in the "voices." Dr. McHale noted that the claimant had numerous signs and symptoms and opined that the claimant was unable to meet the competitive standards in work-related abilities. Dr. McHale indicated that claimant's impairments would cause the claimant to be absent from work more than four days a month. Dr. McHale indicated that the claimant had positive and negative symptoms of schizophrenia including hallucinations, paranoid thoughts, ambivalence, social isolation, and a flat affect. Again, I note that office notes from Monarch have shown that the claimant continues to show significant improvement with medication and therapy.

(Tr. at 32 (internal citation omitted).)

As noted above, the ALJ failed to assign specific weight to Dr. McHale's opinion. The ALJ's discussion implies that the ALJ discounted Dr. McHale's opinions to some degree because Dr. McHale's opinion was purportedly inconsistent with the treatment records showing that Plaintiff had improved with medication and therapy and was "doing well."

9

However, on review of the treatment records, it is not clear exactly how Dr. McHale's opinion is inconsistent with the medical records. By way of general overview, the records reveal that Plaintiff began seeking treatment for an onset of mental health issues in May 2009, resulting in 4 hospitalizations or emergency department visits in the summer and fall of 2009, specifically on May 8, 2009 (Tr. at 551-559, 562); May 25, 2009 (Tr. at 844-845); July 14-15, 2009 (arrived with law enforcement) (Tr. at 834-838, 583-599); and September 19, 2009 (Tr. at 560-567). In late 2009 and early 2010, Plaintiff stabilized on his medications. However, the record reflects that Plaintiff began to have problems with his medications after 6 to 8 months, with hospitalizations or emergency room visits for his bipolar disorder on 4 occasions in late 2010 and through 2011, beginning on October 12-15, 2010 (Tr. at 668-675, 728-731), again 5 months later on March 24-28, 2011 (involuntary commitment) (suicidal ideation and hearing "voice that says to kill people") (Tr. at 676-683, 704-706, 708-715), again 4 months later on July 7, 2011 (Tr. 773-778); and again 5 months later with a 9-day hospitalization in December 2011 (suicidal ideations and "command voices telling him to hurt others") (Tr. 817-828, 862, 867, 856.) Plaintiff experienced some measure of stability in 2012, with only one visit to the Emergency Department on April 30, 2012 (Tr. at 807). However, the 2012 treatment records indicate that Plaintiff was still hearing "voices" and suffering from mood swings, and while the medication helped decrease the symptoms, the symptoms were still present and Plaintiff had good days and bad days. (See Tr. at 895, March 1, 2012: "Some good days, some bad."; Tr. at 894, April 12, 2012: "Feels medication does help some, periods of anger noted . . . voices at times", new medication started; Tr. at 893, May 17, 2012: "Periods of down and feelings of hopelessness"; Tr. at 891, June 21, 2012: "vague suicidal thoughts . . .

10

emotions are up & down", start lithium; Tr. at 890, July 18, 2012: noting auditory hallucinations, blocking thought processes, and paranoia, lithium dosage increased; Tr. at 889, August 8, 2012: noting hallucinations "less", presence of paranoia, and "less" blocking of thought processes; Tr. at 888, September 19, 2012: noting auditory hallucinations "less", prescription for lithium due to schizophrenia; Tr. at 887, October 31, 2012: noting auditory hallucinations "less severe."; Tr. at 886, Dec. 12, 2012: "Voices present but not that strong."; see also Daymark treatment notes, Tr. at 851, January 9, 2012: "I have up days and down days, it's been like that for the past year, one day I'm up, next day I'm feeling hopeless. I think it's something about my bipolar thing."; Tr. at 849, April 11, 2012: "Talked about how he has his good and bad days. Stated that his meds. help keep his mood more stable than without them, but he still has his ups and downs."; Tr. at 848, May 31, 2012: requesting medical appointment for medication adjustment; Tr. at 847, June 4, 2012: "he continues to have his good and bad days.") The record shows that Plaintiff came for appointments on several occasions specifically to try to stabilize his mood (i.e., Tr. at 891, June 21, 2012), and multiple medication adjustments continued to be made during 2012 (Tr. at 886, 888, 890, 891, 893, 894, 895).

The ALJ nevertheless concluded that the treatment records reflected that Plaintiff was doing "well" and that he "continues to show significant improvement with medication and therapy," and on that basis rejected, to some unspecified degree, the opinion of Dr. McHale. However, it is not clear how the treatment records are inconsistent with Dr. McHale's opinion, nor is it clear how the fact that Plaintiff continued to improve with medication and therapy would provide a basis for rejecting Dr. McHale's opinion. Indeed, in his opinion, Dr. McHale specifically noted that "symptoms have reduced with treatment but continues to have residual

11

symptomology." (Tr. at 900.) Moreover, the fact that Plaintiff experienced some periods of improvement, or was "doing well" for someone with bipolar disorder, would not necessarily provide a basis for rejecting Dr. McHale's opinion. See, e.g., Phillips v. Astrue, 413 F. App'x 878, 886 (7th Cir. 2010) (noting that bipolar disorder, like many mental illnesses, is characterized by "'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms."); Brascher v. Astrue, No. 3:10CV256, 2011 WL 1637029, at *7 (E.D.Va. Mar. 11, 2011) ("[T]he phrase 'doing well' is relative and should be viewed in the context of the illness a person suffers from" and "it is not sufficient to focus on the simple phrase of 'doing well' while disregarding the remainder of the physician's report."); Kellough v. Heckler, 785 F.2d 1147, 1153 (4th Cir. 1986) ("Feels well" and "normal activity" must be read in context."); Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000) ("The relevant inquiry with regard to a disability determination is whether the claimant's condition prevents him from engaging in substantial gainful activity. See 42 U.S.C. § 423(d)(1)(A). For a person, such as [claimant], who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic. [The Doctor's] observations that [the claimant] is 'stable and well controlled with medication' during treatment does not support the medical conclusion that [the claimant] can return to work."). Ultimately, the Court is left with significant questions regarding the ALJ's treatment of Dr. McHale's opinion, and those concerns are compounded by the ALJ's failure to address Plaintiff's GAF scores, as discussed below. [5]

---

[5] The Court also notes that in the decision, the ALJ states that Plaintiff "did not receive therapy from April 2011 through October 2011." (Tr. at 31.) However, while it is true that Plaintiff did not return to Monarch between April 21, 2011 and October 2011, the treatment records reveal visits at Daymark on April 4, April 5, April 19, June 7, July 12, and August 30, 2011, and an emergency department visit on July 7, 2011. (Tr. at 31,

12

B.  GAF Scores

Plaintiff next contends that the ALJ failed to properly weigh his GAF scores as medical opinions. In support of this contention, Plaintiff cites 41 separate GAF scores in the record, ranging from 16 to 60, with only one score, Plaintiff's highest, being mentioned in the ALJ's decision. (Pl.'s Br. at 8-9.) Plaintiff now argues that the ALJ's failure to analyze the other forty scores pursuant to 20 C.F.R. §§ 404.1527(c) and 416.927(c) requires remand. (Id.).

Until 2013, mental health clinicians commonly used GAF scores to estimate an individual's overall functioning level at a given point in time. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000)). For example, a score between 51 and 60 indicated "Moderate symptoms (e.g. flat affect and circumlocutory speech, occasional panic attacks) *or* moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34. In contrast, a score between 41 and 50 indicated "Serious symptoms," which may include "severe obsessional rituals" or the inability to keep a job. Id. However, even during their years of wide usage in the mental health field, GAF scores had "no direct legal or medical correlation to the severity requirements of social security regulations." Powell v. Astrue, 927 F. Supp. 2d 267, 273 (W.D.N.C. 2013) (citing Oliver v. Comm'r of Soc. Sec., 415 Fed. App'x 681, 684 (6th Cir. 2011)). Rather, they were "intended to be used to make treatment decisions." Powell, 927 F. Supp. 2d at 273 (citations omitted). As detailed in this District in Emrich v. Colvin,[6]

---

755, 760, 763, 764, 765, 767, 769, 737-745, 746-751, 773-775, 884, 882.) Consistent with the medical records, Dr. McHale's opinion noted that Plaintiff's monthly treatment with Monarch began in October 2011.

[6] The ALJ issued her decision in this case on March 8, 2013, and therefore did not have the benefit of the SSA's further guidance.

13

Case 1:14-cv-00389-JAB-JEP   Document 17   Filed 09/30/16   Page 13 of 18

the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") abandoned the use of GAF scoring altogether. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013) (abandoning use of GAF scoring "for several reasons, including its lack of conceptual clarity . . . and questionable psychometrics in routine practice"). In Administrative Message 13066 (AM–13066), effective July 22, 2013, the SSA acknowledged that the DSM had abandoned use of GAF scoring and instructed ALJs that they should still consider GAF scores as opinion evidence in some circumstances. The SSA explained,

> For purposes of the Social Security disability programs, when it comes from an acceptable medical source, a GAF rating is a medical opinion as defined in 20 CFR §§ 404.1527(a)(2) and 416.927(a)(2). An adjudicator considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by §§ 20 CFR 404.1527(c), 416.927(c), and SSR 06–03p, while keeping the following in mind:
>
> The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.
>
> A GAF score is never dispositive of impairment severity.

Emrich v. Colvin, 90 F. Supp. 3d 480 (M.D.N.C. 2015) (quoting AM-13066); see also AM-13066 ("We consider a GAF rating as opinion evidence. As with other opinion evidence, the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise.").

In the present case, Plaintiff's multiple GAF scores appear to provide additional opinion evidence regarding Plaintiff's level of functioning over time. During 2009, at the onset of Plaintiff's mental illness and before he had been stabilized on medications, Plaintiff's GAF was consistently 40 or 45. (Tr. at 559, 600, 599, 567, 627, 635). On November 30, 2009, Plaintiff underwent a consultative examination with Dr. Bradford, who assigned a GAF of 49.[7] (Tr. at 649.) Five months later, in April 2010, during Plaintiff's apparent 6-8 month period of stability on his medications, Plaintiff was examined by Dr. Willis, who assigned a GAF of 60. (Tr. at 667.) That is the only GAF in the record over 55, and the only GAF score addressed by the ALJ. Consistent with the treatment records, the subsequent GAF scores reflect Plaintiff's increasing difficulties in the latter part of 2010 and through 2011. At his October, 2010 hospitalization, his GAF was 25 (Tr. at 728-30, 668), and was 35 at a later visit in October 2010 and again in December 2010 (Tr. at 689, 690). At his hospitalization 3 months later, in March 2011, his GAF was 16 at admission (Tr. at 683) and 45 at discharge (Tr. at 711). During the period from April 2011 through November 2011, his GAF was 51, 50, and 55. (Tr. at 745,

---

[7] In the consultative examination on November 30, 2009, Dr. Bradford assessed a GAF of 49 and noted moderate difficulties in performing work on a consistent basis, moderate difficulties interacting with co-workers and the public, and moderate difficulties dealing with the stress of a competitive work environment. (Tr. at 650.) The ALJ discounted Dr. Bradford's opinion based on progress notes from Daymark indicating that, on November 16, 2009, Plaintiff reported "that he felt better on medication," reported "no current symptoms," said he was "not depressed," and "denied any current or past psychotic symptoms, delusions or thoughts that were bothersome." (Tr. at 30.) The ALJ also noted that in December 2009, Plaintiff reported feeling "well" with no manic or depressive symptoms, and in January 2010, he reported that he was sad but no hypomanic or manic symptoms. The ALJ concluded that the severity of Plaintiff's mental illness reported to Dr. Bradford is "not fully supported by progress notes from Daymark" because Plaintiff "continued to do well on his medication and he denied any psychotic, manic or depressive symptoms." (Tr. at 31.) However, the ALJ did not address the portion of Plaintiff's same November 16, 2009 Daymark visit that reflected a GAF of 40 (Tr. at 635). In addition, the same treatment notes from Daymark noted depression, lack of motivation and energy, crying, aggressiveness, and incongruent moot and affect on November 6, 2009 (Tr. at 615, 623), and presenting as tearful and depressed on November 17, 2009, and November 24, 2009, and as tense, anxious and depressed on December 1, 2009 (Tr. at 640, 641, 642).

15

748, 795-797, 899). However, he was hospitalized in December 2011 with a GAF of 36 (Tr. at 817, 862, 867), and after his release, he was given a GAF of 40 in January 2012 (Tr. at 856). Throughout the remainder of 2012, Plaintiff's GAF was 50, 52, 52, 50, 50, 51, 51, 51, 51, and 51, reflecting improvement and stability, but also reflecting ongoing difficulties in functioning. It may be that those determinations fail to support Dr. McHale's opinion or are sufficiently taken into account in the RFC, but because the ALJ did not address the GAF scores at all, other than the single score of 60, the Court cannot determine the basis for the ALJ's reasoning. While the ALJ is not required to note every piece of evidence, there is some particular concern here given the ALJ's citing of the single higher GAF score, without addressing or explaining the rationale for disregarding the remaining GAF scores, which themselves are to be treated as opinion evidence and which help provide additional context and information consistent with the treatment notes. For example, to the extent that the ALJ relies on treatment notes reflecting that Plaintiff is "doing well" or "improving," the GAF scores provide additional information and context for those statements with respect to Plaintiff's abilities, and the ALJ's reliance on portions of the treatment records, without addressing or reconciling the GAF scores, raises additional difficulties in attempting to undertake a meaningful review.

    In light of all of these concerns, the Court concludes that the ALJ's failure to address all of the relevant opinion evidence, including the GAF scores, and failure to sufficiently explain the treatment of Dr. McHale's opinion, renders it impossible for the Court to fairly undertake meaningful review of the ALJ's decision. In addition, to the extent the ALJ intended to reject Dr. McHale's opinion as inconsistent with the treatment records, it is not clear how Dr. McHale's opinion is inconsistent with the treatment records, as discussed above.

Moreover, the Court notes that the ALJ also apparently rejected the opinion of the consultative examiner Dr. Bradford, and failed to address the opinions of the 2011 state agency consultants, and instead apparently relied only on the 2009 state agency consultants' opinions and the ALJ's own review of the more recent medical records.[8] Of course, the Court does not itself re-weigh the evidence, but where the ALJ has failed to address substantial portions of the evidence, or has only selectively addressed the evidence in the record and excluded consideration of conflicting evidence, or has failed to clearly assign weight to the relevant opinion evidence, the Court cannot undertake meaningful review to determine if the ALJ's conclusion is supported by substantial evidence.

C. <u>Mascio</u> Issues

In supplemental briefing, Plaintiff raises three challenges based on the Fourth Circuit's decision in <u>Mascio v. Colvin</u>, 780 F.3d 632 (4th Cir. 2015). Specifically, he alleges that the ALJ (1) failed to properly assess his capacity to perform certain relevant functions, despite conflicting evidence in the record regarding these abilities, (2) failed to properly include RFC limitations resulting from Plaintiff's moderate difficulties in maintaining concentration, persistence, or pace, and (3) improperly relied on boilerplate credibility language without explaining which of Plaintiff's statements she believed and which ones she discredited.

The Court notes that at the time of the ALJ's decision, the ALJ did not have the benefit of the Fourth Circuit's decision in <u>Mascio</u>, and in light of the issues noted above, it appears

---

[8] As noted by Plaintiff in the supplemental briefing, the ALJ's decision considers the opinions of the state agency physicians from 2009 and 2010 prior to the first hearing (Dr. Fox and Dr. Harrison), but does not address at all the subsequent opinions of the state agency consultants in 2011 (Dr. Aldridge and Dr. Fulmer). (Tr. at 161-165, 188-193.)

17

that the ALJ can consider the effect of Mascio as part of the remand in this case. Therefore, given that remand is required for the reasons already set out above, the Court need not further resolve the Mascio contentions at this time.[9]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for further consideration of Plaintiff's claims in light of the above recommendation. Defendant's Motion for Summary Judgment [Doc. #11] should be DENIED, and Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #9] should be GRANTED to the extent set out herein.

This, the 30th day of September, 2016.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

[9] The Court also notes that the RFC specifically included Plaintiff's ability to "follow short, simple (not detailed instructions." (Tr. at 27.) However, the occupations identified by the ALJ at step five all require a DOT Reasoning Level of 2, which requires the employee to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." Dictionary of Occupational Titles, 1991 WL 688702 (2008); see Henderson v. Colvin, 643 F. App'x 273, 277 (4th Cir. 2016) (concluding that "there is an apparent conflict between an RFC that limits [the claimant] to one-to-two step instructions and GED Reasoning Code 2, which requires the ability to understand detailed instructions," and "the VE's conclusory statement that a conflict did not exist was insufficient."); Vigen v Commissioner, 2016 WL 4687813 (D. Md. Sept. 7, 2016). In light of the need for a remand for the reasons set out above, the Court need not further address this issue in the present case. Likewise, the Court need not further address the other issues raised by Plaintiff in her briefing.